UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:22-cv-00227-RJC-DSC

| | |
|---|---|
| PETER MARCO, LLC and PETER VOUTSAS, ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | Order |
| BANC OF AMERICA MERCHANT SERVICES, LLC et al., ) ) ) | |
| Defendants. ) | |

**THIS MATTER** is before the Court on the Defendants' Motion to Dismiss (Doc. No. 38) and the Magistrate Judge's Memorandum and Recommendation ("M&R") (Doc. No. 47). For the reasons below, the M&R is **ADOPTED in part** and the Motion to Dismiss is **GRANTED**.

**I. BACKGROUND[1]**

This dispute arose after a multimillion-dollar jewelry sale went wrong. Peter Voutsas, the sole member of Peter Marco, LLC, sells jewelry in Beverly Hills. Am. Compl. ¶ 1, Doc. No. 24-1. In mid-2019, he jumped at the opportunity to make a $4.5-million-dollar sale. *Id.* ¶¶ 29–30. But before he closed the deal, Voutsas spoke with a representative from Bank of America, the bank affiliated with Peter Marco's card-processing account. *Id.* ¶¶ 19, 33; *see also* Merchant Processing Agreement 5, Doc. No. 24-2. Voutsas met with the representative because the sale raised some "red flags." Am. Compl. ¶ 31. The man seeking to buy jewelry said he was doing so as the attorney in fact for a woman who lived in Mexico (whose Visa debit card he had), and he wanted to split

---

[1] No party objects to the M&R's description of this case's factual and procedural background. Accordingly, the Court adopts that description. In this order, the Court sets out only the facts that are relevant to the issues presented.

about 40% of the sale into multiple transactions and pay the remainder as a lump sum. *Id.* ¶¶ 30–34, 38. The bank's representative approved the arrangement after meeting with Voutsas, the buyer, and the cardholder. *Id.* ¶¶ 33–36. Voutsas then charged the Visa card $2,322,846.23 in twenty-eight transactions. *Id.* ¶¶ 36, 38.

But the cardholder reneged. She initiated twenty-eight chargebacks, which returned the money to her. *Id.* ¶ 38–39. Peter Marco was then charged $99,000 in fees and had $317,607.73 placed in a reserve account. *Id.* ¶¶ 41–42. Additionally, Peter Marco's card-processing account was terminated, and Peter Marco and Voutsas were placed on Mastercard's "MATCH" list,[2] which effectively barred Peter Marco from accepting electronic payments from its customers. *Id.* ¶¶ 43, 46.

In the aftermath, Voutsas and Peter Marco sued multiple companies. In addition to Bank of America, they sued Banc of America Merchant Services, LLC ("BAMS"), the company that served as Peter Marco's card processor. *Id.* ¶¶ 2, 19; Merchant Processing Agreement 5.[3] Voutsas and Peter Marco assert eight claims against both companies. They contend that the companies breached the Merchant Processing Agreement that governed Peter Marco's card-processing account. Am. Compl. ¶¶ 49–59. They also allege that BAMS and Bank of America violated the implied covenant of good faith and fair dealing. *Id.* ¶¶ 60–72. And turning from contractual claims, they assert claims for fraud, negligence, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and declaratory relief. *Id.* ¶¶ 73–103, 117–133. They also assert a claim under the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200. *Id.* ¶¶ 104–116.

---

[2] "MATCH" stands for "Member Alert to Control High Risk." Am. Compl. ¶ 12, Doc. No. 24-1. Once someone is placed on the MATCH list, it is "extremely difficult to obtain a new merchant account." *Id.* ¶ 12.
[3] According to a declaration filed by Jill E. Dokson, Banc of America Merchant Services, LLC is now JV Wind Down LLC. Dokson Decl. ¶ 6, Doc. No. 38-2, Ex. 1.

2

Voutsas and Peter Marco also sued four other companies: First Data Merchant Services, LLC; First Data Corporation; First Data Global Leasing; and First Data Merchant Services Corporation.[4] Voutsas and Peter Marco allege that these companies perform various processing services for BAMS and Bank of America. *Id.* ¶¶ 3–4. The Amended Complaint does not explain which claims are asserted against which Defendants.

The Defendants filed a motion to dismiss under Rule 12(b)(6). Doc. No. 38. The M&R recommends dismissing four claims: the claim for breach of the covenant of good faith and fair dealing, the claim for aiding and abetting a breach of fiduciary duty, the claim brought under the California Unfair Competition Law, and the claim for declaratory relief. M&R 21, Doc. No. 47. But it concludes that the claims for breach of contract, breach of fiduciary duty, fraud, and negligence should survive. *Id.* The Defendants object to part of the M&R, arguing that all the Plaintiffs' claims should be dismissed. Defs.' Objs. 1, Doc. No. 48. The Plaintiffs filed no objections to the M&R.[5]

## II. STANDARD OF REVIEW

A district court may assign dispositive pretrial matters, including motions to dismiss, to a magistrate judge for "proposed findings of fact and recommendations." 28 U.S.C. § 636(b)(1)(A), (B). The Federal Magistrate Act provides that a district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which

---

[4] Per Dokson's declaration, First Data Merchant Services LLC used to be First Data Merchant Services Corporation, Dokson Decl. ¶ 3, and First Data Global Leasing is not a legal entity but a division of First Data Merchant Services LLC, *id.* ¶ 9.

[5] The Plaintiffs do not object to the M&R's analysis of the claims it recommends for dismissal: the claim for breach of the covenant of good faith and fair dealing, the claim for aiding and abetting a breach of fiduciary duty, the claim brought under the California Unfair Competition Law, and the claim for declaratory relief. Accordingly, the M&R's analysis of these issues (along with all the other unobjected-to issues) is not subject to de novo review. *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005). There is no "clear error" in the M&R's analysis of these issues. *Id.* (quoting Fed. R. Civ. P. 72, advisory committee's note).

3

objection is made." *Id.* § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3). However, "when objections to strictly legal issues are raised and no factual issues are challenged, de novo review of the record may be dispensed with." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). De novo review is also not required "when a party makes general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." *Id.* Similarly, when no objection is filed, "a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.,* 416 F.3d 310, 315 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72, advisory committee note).

The standard of review for a motion to dismiss is well known. A motion to dismiss brought under Rule 12(b)(6) "'challenges the legal sufficiency of a complaint,' including whether it meets the pleading standard of Rule 8(a)(2)." *Fed. Nat'l Mortg. Ass'n v. Quicksilver LLC*, 155 F. Supp. 3d 535, 542 (M.D.N.C. 2015) (quoting *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009)). A complaint attacked under Rule 12(b)(6) will survive if it contains enough factual matter "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). An allegation is facially plausible if it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Specific facts are not necessary, and the statement need only "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (alteration omitted). Additionally, when ruling on a motion to dismiss,

4

a court "should view the complaint in a light most favorable to the plaintiff," *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993), and it must accept the complaint's factual allegations as true, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nonetheless, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). And at the motion-to-dismiss stage, "[c]ourts cannot weigh the facts or assess the evidence," though "a complaint entirely devoid of any facts supporting a given claim cannot proceed." *Potomac Conf. Corp. of Seventh-Day Adventists v. Takoma Acad. Alumni Ass'n, Inc.*, 2 F. Supp. 3d 758, 768 (D. Md. 2014) (emphasis omitted).

### III. DISCUSSION

#### A. Universal Objections

The Defendants argue that the M&R erred in concluding that the Plaintiffs' claims for breach of contract, breach of fiduciary duty, fraud, and negligence should survive. Defs.' Objs. 1, Doc. No. 48. Before addressing each claim, the Defendants make three universal objections. They first contend that the claims against the four First Data Defendants should be dismissed because those Defendants were not parties to the Merchant Processing Agreement. *Id.* at 3–4. The Defendants also claim that Voutsas was not a party to the Agreement, so they contend that his claims should be dismissed too. *Id.* at 4. And they argue that, if Peter Marco can state any claim against BAMS or Bank of America, Peter Marco is nevertheless limited to a recovery of $50,000 in direct damages. *Id.* at 5–6.

##### 1. The First Data Defendants

The Plaintiffs fail to state a claim that the First Data Defendants breached the Merchant Processing Agreement. A breach-of-contract claim has two elements: the existence and breach of a contract. *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000). Here, the Plaintiffs fail to adequately plead that the First Data Defendants were parties to the Merchant Processing

5

Agreement. The Merchant Processing Agreement identifies the parties to the agreement: the "Client," which is "Peter Marco LLC"; the "Processor," which is "Banc of America Merchant Services, LLC"; and the "Bank," which is "Bank of America, N.A." Merchant Processing Agreement 1, 5, Doc. No. 24-2 (capitalization omitted); *see also* Am. Compl. ¶ 19 ("Peter Marco entered into a merchant processing agreement ('MPA') with *BAMS* and *Bank of America*." (emphasis added)). This documentary evidence prevails over the Plaintiffs' conclusory assertion that the First Data Defendants were bound by the Merchant Processing Agreement. Am. Compl. ¶ 50; *see Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) ("[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails.").[6]

In their Reply, the Plaintiffs argue that the First Data Defendants are third-party beneficiaries under the Merchant Processing Agreement. Pls.' Reply 2, Doc. No. 49. But the third-party-beneficiary theory does not allow a party that made a contract to bring a breach-of-contract claim against a third-party beneficiary. Rather, the theory recognizes "a right to performance *in the beneficiary*." Restatement (Second) of Contracts § 302 (1981) (emphasis added). Thus, the "intended beneficiary may enforce" a contractual promise against a party to the contract, not the other way around. *Id.* § 304; *see also Raritan River Steel Co. v. Cherry, Bekaert & Holland*,

---

[6] Peter Marco did enter into a lease agreement with First Data Merchant Services Corporation (which is now named First Data Merchant Services LLC). But the other First Data Defendants were not parties to that agreement. *See* Equipment Lease Agreement 1, Doc. No. 38-2, Ex. B ("This Equipment Lease Agreement . . . is being entered into by and between First Data Merchant Services Corporation and the Lessee identified in the signature panel of this Agreement."). For purposes of this order, the party that entered into the Equipment Lease Agreement with Peter Marco will be referred to as First Data Merchant Services Corporation. Except for First Data Merchant Services Corporation, Peter Marco fails to adequately allege that it created a contract with the First Data Defendants. And as explained in Section B below, Peter Marco does not adequately allege that First Data Merchant Services Corporation breached the Equipment Lease Agreement.

6

407 S.E.2d 178, 181 (N.C. 1991) (stating that, under the third-party-beneficiary theory, "a *beneficiary* of an agreement made by others *has a right of action* on that agreement" (emphasis added)). Besides, the Plaintiffs nowhere plead that "the parties who actually made the contract"—Peter Marco, BAMS, and Bank of America—"intended that [the First Data Defendants] should receive a benefit which might be enforced in the courts." *Snyder v. Freeman*, 266 S.E.2d 593, 604 (N.C. 1980) (describing the test used to determine if a party is a third-party beneficiary); *see also Davis & Taft Architecture, P.A. v. DDR-Shadowline, LLC*, 835 S.E.2d 473, 477–78 (N.C. Ct. App. 2019). The Amended Complaint pleads no facts that support a third-party-beneficiary theory, and "parties cannot amend their complaints through briefing." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).

Even if they cannot pursue a claim against the First Data Defendants for a breach of the Merchant Processing Agreement, the Plaintiffs argue that they can still assert claims for breach of fiduciary duty, fraud, and negligence against those Defendants. Pls.' Reply 2–3. But the Amended Complaint contains no allegations about how the First Data Defendants were involved in the 2019 transaction, if at all. Indeed, the Plaintiffs concede ignorance on this point. They allege that "[t]he MPA [Merchant Processing Agreement] states that FDC, FDMS, and FDGL [the First Data Defendants] are involved in some capacity, but it is not made clear which party has what function." Am. Compl. ¶ 22. Even if the Plaintiffs adequately alleged the First Data Defendants' involvement, the claims against those Defendants for breach of fiduciary duty, fraud, and negligence still fail for the reasons given in Section B below.

    2.    <u>Voutsas's Claims</u>

Voutsas fails to state a breach-of-contract claim against BAMS and Bank of America. He was not a party to the Merchant Processing Agreement, which he signed only "in his capacity as

7

President and Chief Executive Officer of Peter Marco." Am. Compl. ¶ 26. Nor was he a party to the Lease Agreement, which he also signed only as Peter Marco's President. *See* Equipment Lease Agreement 1, Doc. No. 38-2, Ex. B. Thus, he fails to plead the "existence of a valid contract" between him and another party. *Poor*, 530 S.E.2d at 843. However, Voutsas's other claims do not depend on privity of contract. Those claims are analyzed in Section B below.

### 3. Limitation on Damages

Relying on a limitation-of-liability clause, the Defendants argue that the Plaintiffs are unable to recover consequential damages and are limited to a recovery of $50,000 in direct damages. Defs.' Objs. 5–6. But this is not the stage to decide that issue. The scope of the Plaintiffs' remedies does not affect whether their Amended Complaint "state[s] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Accordingly, the Court declines to analyze the limitation-of-liability clause at this stage.

## B. Specific Claims

### 1. Breach of Contract

The Defendants' argument against the Plaintiffs' breach-of-contract claim centers largely on the Defendants' contention that a document called the Program Guide was incorporated into the Merchant Processing Agreement. Defs.' Objs. 12–15. The Plaintiffs did not attach the Program Guide to their Amended Complaint; instead, it was attached to the Defendants' Motion to Dismiss. For that reason, the Magistrate Judge did not consider it. M&R 11. However, a court may consider documents that are "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

The Program Guide is authentic and integral to the Amended Complaint. The terms of the Program Guide were incorporated into the Merchant Processing Agreement, which states:

8

> Client [Peter Marco] acknowledges having received and read a copy of . . . the Program Guide, consisting of Parts I-V (which includes terms and conditions for each of the services . . . and a Confirmation Page) . . . and agrees to be bound by all provisions as printed therein.

Merchant Processing Agreement 5. The Amended Complaint is based largely on the Merchant Processing Agreement, and since that agreement incorporates the terms of the Program Guide, the Program Guide is integral to the Amended Complaint.

The Program Guide is also authentic. Voutsas signed the Program Guide on behalf of Peter Marco on the same day that he signed the Merchant Processing Agreement and the Equipment Lease Agreement. *See* Program Guide, pt. V: Confirmation Page, Doc. No. 38-2, Ex. A (signed by Peter Voutsas as the President of Peter Marco on August 28, 2015); Merchant Processing Agreement 5 (same); Equipment Lease Agreement 1 (same). And the signed Program Guide was authenticated by a declaration from Jill E. Dokson. Doc. No. 38-2, Ex. 1; *see McGuire v. Lord Corp.*, 2019 WL 4858850, *2–3 (E.D.N.C. Sept. 30, 2019) (concluding that an agreement was authentic where it was signed by the plaintiff and authenticated by a declaration). Thus, the Program Guide, as incorporated into the Merchant Processing Agreement, will be considered by the Court in resolving the Defendants' Motion to Dismiss.[7]

For two reasons, Peter Marco fails to adequately plead that BAMS and Bank of America breached the terms of the parties' Agreement.[8] *See Poor*, 530 S.E.2d at 843 (stating that a party asserting a breach-of-contract claim must show that the contract was breached). First, Peter Marco does not identify a single provision of the Agreement that was allegedly breached. *See* Am. Compl. ¶¶ 49–59. And second, Peter Marco complains of conduct that is not prohibited by the Agreement.

---

[7] In their Reply, the Plaintiffs assert that the Program Guide is "ambiguous and unconscionable." Pls.' Reply 2, Doc. No. 49. But the Amended Complaint contains no facts to support those conclusory allegations.

[8] The Merchant Processing Agreement, considered with the Program Guide's incorporated terms, will be referred to as "the Agreement."

*See Goines*, 822 F.3d at 166 ("[D]ismissal is appropriate if the document negates the claim." (quoting *Thompson v. Ill. Dep't of Pro. Regul.*, 300 F.3d 750, 754 (7th Cir. 2002))).

The Agreement places the risk of chargebacks on Peter Marco. It states that Peter Marco is "responsible for all [c]hargebacks, . . . [c]hargeback fees, and related costs arising from [its] transactions." Program Guide pt. I, § 10.1.1; *see also id.* pt. I, § 51 (explaining that the "[c]lient [Peter Marco] is responsible for payment to us [BAMS and Bank of America] for all [c]hargebacks"). It warns Peter Marco that "[c]ards present risks of loss and non-payment that are different than those with other payment systems." *Id.* intro., at 3. It states that Peter Marco, "[i]n deciding to accept [c]ards, [is] . . . also accepting these risks." *Id.* And the Agreement warns Peter Marco that, "[i]f proper procedures are not followed at the time of [a] transaction," Peter Marco would be "subject to a Chargeback and [its] account may be debited for the amount of the transaction." *Id.* pt. I, § 2.[9] The Agreement explains that the chargeback process is managed by card brands like Visa and Mastercard, not by BAMS or Bank of America, and it states that BAMS and Bank of America are not responsible for chargebacks made by a cardholder:

> We [BAMS and Bank of America] do not decide what transactions are charged back and we do not control the ultimate resolution of the [c]hargeback. While we can attempt to reverse a [c]hargeback to the [i]ssuer, we can only do so if the [i]ssuer agrees to accept it or the [c]ard [o]rganization requires the [i]ssuer to do so after a formal appeal process. Sometimes, your [Peter Marco's] customer may be able to successfully chargeback a [c]ard transaction even though you have provided your goods or services and are otherwise legally entitled to payment from your customer. While you may still be able to pursue claims directly against that customer, neither we nor the [i]ssuer will be responsible for such transactions. You will be responsible for all [c]hargebacks and adjustments associated with the transactions that you submit for processing."

---

[9] According to the facts alleged in the Amended Complaint, proper procedures were not followed during the 2019 transaction. *See* Program Guide pt. I, § 1.4, Doc. No. 38-2, Ex. A (prohibiting cardholders from authorizing another person to use his or her card to make a purchase); *id.* pt. I, § 20.1.8 (prohibiting Peter Marco from completing more than one card transaction per sale).

10

*Id.* intro., at 3.

Peter Marco alleges that BAMS and Bank of America violated the Agreement when they "failed to contact Peter Marco or Mr. Voutsas regarding [Peter Marco's] processing activity or business model to determine if Peter Marco was operating in compliance with the Card Brand Rules." Am. Compl. ¶ 52.[10] But under the Agreement, BAMS and Bank of America had no obligation to ensure Peter Marco's compliance with the Card Brand Rules. Rather, *Peter Marco* "agree[d] to . . . comply with all applicable Card Organization Rules." Program Guide pt. I, § 15; *see also id.* ("You [Peter Marco] are responsible for . . . maintaining compliance with the Card Organization Rules."). Additionally, the Agreement states that BAMS and Bank of America "may consider th[e] Agreement to be terminated immediately, without notice" if there are "irregular [c]ard sales by [Peter Marco]," "excessive [c]hargebacks," or "any other circumstances which, in [BAMS' and Bank of America's] sole discretion, may increase [their] exposure for [Peter Marco's] [c]hargebacks or otherwise present a financial or security risk to [BAMS and Bank of America]." *Id.* pt. I, § 23.4.4, 23.4.11 (subsequent flush language).

Peter Marco also alleges that BAMS and Bank of America "failed to defend or even inquire as to Visa's notification regarding Peter Marco." Am. Compl. ¶ 52. The Amended Complaint contains no details about a notification to Visa. And again, the Agreement requires Peter Marco to ensure its own compliance with any applicable Card Brand Rules. Program Guide pt. I, § 15. Peter Marco asserts that BAMS and Bank of America "unreasonably put Peter Marco and Mr. Voutsas on the MATCH list." Am. Compl. ¶ 52. But the Agreement specifically insulates BAMS and Bank of America from liability arising out of Voutsas's and Peter Marco's inclusion on that list:

---

[10] According to the Amended Complaint, companies like Visa and Mastercard issue rules that govern card payments. Am. Compl. ¶¶ 6–7. Those rules are called "Card Brand Rules." *Id.* at ¶ 7.

> If this Agreement is terminated for cause, you [Peter Marco] acknowledge that we [BAMS and Bank of America] may be required to report your business name and the names and other information regarding its principals to the [c]ard [o]rganizations for inclusion on [the MATCH] list[]. . . . [Y]ou agree to waive and hold us harmless from and against any and all claims which you may have as a result of such reporting.

Program Guide pt. I, § 23.8.

Peter Marco also challenges the $99,000 fee it was charged, claiming that the fee is "unreasonable." Am. Compl. ¶ 53. However, under the Agreement, Peter Marco "agree[d] to pay [BAMS and Bank of America] for . . . excessive [c]hargeback handling fees" and for "[c]hargeback costs related to th[e] Agreement." Program Guide pt. I, § 18.8. Similarly, Peter Marco contends that, "without any justification," BAMS and Bank of America "held at least $317,607.73 in funds that are due to Peter Marco." Am. Compl. ¶ 53. But the Agreement also authorizes that retention:

> You [Peter Marco] expressly authorize us [BAMS and Bank of America] to establish a Reserve Account . . . . The amount of such Reserve Account shall be set by us, in our sole discretion, based upon your processing history and the potential risk of loss to us as we may determine from time to time.

Program Guide pt. I, § 24.1.[11]

Thus, none of the complained-of actions could have breached the Agreement. The terms of the Agreement therefore "negate[] the claim." *Goines*, 822 F.3d at 166; *see also id.* ("[I]f a breach-of-contract plaintiff alleges a failure to perform an act required by the contract, the contract's description of the defendant's duties will prevail over the plaintiff's contrary characterization.").

Peter Marco also fails to adequately plead that First Data Merchant Services Corporation

---

[11] Peter Marco alleges that the Defendants "unreasonably failed to underwrite the Peter Marco account." Am. Compl. ¶ 52. It is unclear what that allegation means. It also appears to contradict another allegation. *See id.* ¶ 17 ("Upon information and belief, BAMS and/or FDMS performed underwriting related to Peter Marco's merchant account application.").

12

breached the Equipment Lease Agreement.[12] Under that agreement, Peter Marco leased a payment card processing machine for $34.95 a month. Am. Compl. ¶ 14; Equipment Lease Agreement 1. Peter Marco alleges that First Data Merchant Services Corporation breached the Equipment Lease Agreement by "continu[ing] to charge Mr. Voutsas" after "the equipment had become unusable" due to the "termination of the processing agreement." Am. Compl. ¶¶ 44, 55; *see also id.* ¶ 44 (stating that "Mr. Voustas [sic] also continued to make monthly payments on the lease"). But Peter Marco identifies no term in the Equipment Lease Agreement that prohibits First Data Merchant Services Corporation from requesting payments after the Merchant Processing Agreement is terminated. And the Equipment Lease Agreement specifies that "lease payments will be due despite dissatisfaction for any reason with the [e]quipment or related processing services." *Id.* § 10(d); *see also* Program Guide pt. I, § 23.2 ("If you [Peter Marco] have an equipment lease, termination of this Agreement does not terminate that equipment lease."). Therefore, Peter Marco does not adequately allege a violation of the Equipment Lease Agreement.

2. Breach of Fiduciary Duty

The Plaintiffs do not adequately plead a breach-of-fiduciary-duty claim. They allege that the Defendants owed them a fiduciary duty because the Defendants "held [the] Plaintiffs' money for periods of time and were tasked to oversee [the] Plaintiffs' credit and debit card processing." Am. Compl. ¶ 74; *see also id.* ¶ 75. But that allegation mistakenly "seeks to establish a fiduciary relationship arising out of the operation of a general business relationship." *Sykes v. Health*

---

[12] As mentioned above, Peter Marco entered into a lease agreement with First Data Merchant Services Corporation (which is now named First Data Merchant Services LLC). The other First Data Defendants were not parties to that agreement. *See* Equipment Lease Agreement 1, Doc. No. 38-2, Ex. B ("This Equipment Lease Agreement . . . is being entered into by and between First Data Merchant Services Corporation and the Lessee identified in the signature panel of this Agreement.").

13

*Network Sols., Inc.*, 828 S.E.2d 467, 476 (N.C. 2019). True, a fiduciary relationship arises when one party places "special confidence" in another party, giving the latter "superiority and influence" over the former. *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 659 S.E.2d 442, 451 (N.C. Ct. App. 2008). Yet "[North Carolina] courts have been clear that general contractual relationships do not typically rise to the level of fiduciary relationships." *Sykes*, 828 S.E.2d at 476; *see also id.* ("[T]ypical contractual relationships do not give rise to the special status of a fiduciary relationship."); *Branch Banking & Tr. Co. v. Thompson*, 418 S.E.2d 694, 699 (N.C. Ct. App. 1992) ("[P]arties to a contract do not thereby become each others' fiduciaries; they generally owe no special duty to one another beyond the terms of the contract . . . ."). And here, under the facts alleged in the Amended Complaint, any relationship between the parties is based on only their contracts with each other. *See* Am. Compl. ¶¶ 6–28, 49–59. All the acts that allegedly gave rise to a fiduciary relationship occurred because of those contracts. And the Plaintiffs "fail[] to plead any facts to demonstrate that the relationship between the parties was one of trust and confidence and not a straightforward business transaction between . . . credit card processor[s] and a merchant." *Taylor Bldg. Mgmt., Inc. v. Glob. Payments Direct, Inc.*, 2008 WL 2067096, *6–7 (N.Y. Sup. Ct. 2008) (applying New York law). Thus, the parties' "contractual relationship . . . is insufficient to establish a fiduciary relationship." *Sykes*, 828 S.E.2d at 477.

        3.    <u>Fraud</u>

The Plaintiffs fail to plead a viable fraud claim. To state such a claim, a plaintiff must provide "the time, place and contents of the fraudulent representation, the identity of the person making the representation and what was obtained by the fraudulent acts or representations." *Terry v. Terry*, 273 S.E.2d 674, 678 (N.C. 1981); *see also* Fed. R. Civ. P. 9(b) (requiring plaintiffs to plead "the circumstances constituting fraud" with "particularity"). As an initial matter, the

Plaintiffs allege such particularized details only in relation to fraudulent representations made by BAMS. *See* Am. Compl. ¶¶ 91, 95, 99 (providing details about allegedly fraudulent statements made by BAMS representatives at a Bank of America branch in August 2015 and May 2019). The Amended Complaint does not provide particularized details about any allegedly fraudulent misrepresentations made by the other Defendants.[13] Accordingly, the Plaintiffs fail to adequately plead a fraud claim against Bank of America and the First Data Defendants from the start.

As for their fraud claim against BAMS, the Plaintiffs fail to adequately plead an element of the claim: reasonable reliance. *See Head v. Gould Killian CPA Grp., P.A.*, 812 S.E.2d 831, 837 (N.C. 2018) ("[A]ny reliance on the allegedly false representations must be reasonable."); *MacFadden v. Louf*, 643 S.E.2d 432, 435 (N.C. Ct. App. 2007) (holding that a plaintiff failed to prove her "claim of fraud" because "the evidence fails to establish reasonable reliance"); *Helms v. Holland*, 478 S.E.2d 513, 517 (N.C. Ct. App. 1996) ("Justifiable reliance is an essential element of both fraud and negligent misrepresentation."). The statements allegedly made by the BAMS representatives contradict the terms of the parties' Agreement, so it would have been unreasonable for the Plaintiffs to rely on those statements.

The Plaintiffs allege that the BAMS representatives said that the "credit card services provided by [the Defendants] were safe and secure," that the "credit card processing system was

---

[13] In passing, the Amended Complaint asserts that "the BAMS Representative" was "the agent of Defendants." Am. Compl. ¶ 91. But that is a "legal conclusion couched as a factual allegation" that the Court need not "accept as true." *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014). Further, nowhere does the Amended Complaint allege facts that would satisfy the elements of an agency relationship. *See State v. Weaver*, 607 S.E.2d 599, 606 (N.C. 2005) (describing the elements of an agency relationship); *Bauer v. Douglas Aquatics, Inc.*, 698 S.E.2d 757, 764–65 (N.C. Ct. App. 2010) (same). Even if the BAMS representatives were agents of the other Defendants, the Plaintiffs would still fail to state a fraud claim against those Defendants because, as explained below, the Plaintiffs do not adequately plead that they reasonably relied on the representatives' statements.

15

capable of identifying suspicious transactions prior to being approved by Defendants so as to avoid costs to merchants," and that the Defendants "had a policy of investigating any allegations of suspicious transactions thoroughly and in good faith before drawing any conclusion about who was responsible for the transaction." Am. Compl. ¶ 91; *see also id.* ¶ 99. But as explained above, the Agreement makes Peter Marco "responsible for all [c]hargebacks, . . . [c]hargeback fees, and related costs arising from [its] transactions." Program Guide pt. I, § 10.1.1. And it warns that "[c]ards present risks of loss and non-payment that are different than those with other payment systems." *Id.* intro., at 3. It states that a merchant, "[i]n deciding to accept [c]ards, [is] . . . accepting these risks." *Id.* It also explains that "[a] customer may be able to successfully chargeback a [c]ard transaction even though [the merchant has] provided [its] goods or services and [is] otherwise legally entitled to payment," clarifying that merchants—not BAMS and Bank of America—are "responsible for all [c]hargebacks and adjustments associated with the transactions that [they] submit for processing." *Id.* Even the Agreement's "recommendations on how to reduce the risk of [c]hargebacks" comes with the caveat that "[t]hese are recommendations only, and do not guarantee that [a merchant] will be able to prevent [c]hargebacks." *Id.* pt. I, § 10.1.4. The Agreement also "outlines the most common types of [c]hargebacks," explaining that chargebacks can happen due to "[f]raud" when "the [c]ardholder claims" that a transaction was "unauthorized." *Id.* § 10.1.4, 10.1.4(3); *see also id.* § 10.1.4(3) (stating that a "[f]raud [r]elated [c]hargeback" may occur when "[m]ultiple transactions were completed with a single card without the [c]ardholder's permission"); *id.* § 2 (explaining that "jewelry" is a type of "[f]raud-[p]rone [m]erchandise" because it "can easily be resold," and stating that a merchant should "[b]e suspicious of high dollar amounts and transactions with more than one fraud-prone item").

The Plaintiffs also allege that the Defendants "falsely represented that the transactions of

16

Peter Marco could be processed in compliance with the Card Brand Rules by using the methods described by Mr. Voutsas and . . . which were performed by him related to the triggering event." Am. Compl. ¶ 93. But again, under the Agreement, it was Peter Marco's responsibility to process its transactions in accordance with the rules. *See* Program Guide pt. I, § 15 ("You [Peter Marco] agree to . . . comply with all applicable Card Organization Rules."); *see also id.* ("You [Peter Marco] are responsible for . . . maintaining compliance with the Card Organization Rules."). The Plaintiffs allege that the Defendants "falsely represented that Peter Marco would receive all of its funds back from Defendants, including any funds that Defendants held in reserve." Am. Compl. ¶ 94. Yet in the Agreement, Peter Marco "expressly authorize[d]" BAMS and Bank of America to "establish a [r]eserve [a]ccount," agreeing that "[t]he amount of such [r]eserve [a]ccount [would] be set by [BAMS and Bank of America], in [their] sole discretion." Program Guide pt. I, § 24.1. The Agreement also makes Peter Marco "responsible for all [c]hargebacks" and states that BAMS and Bank of America will not be "responsible for such transactions." *Id.* intro., at 3; *see also id.* pt. I, § 2 ("If proper procedures are not followed at the time of the transaction, you [Peter Marco] are subject to a [c]hargeback and your account may be debited for the amount of the transaction."); *id.* pt. I, § 18.8 ("You [Peter Marco] agree to pay [BAMS and Bank of America] for . . . excessive [c]hargeback handling fees . . . [and] [c]hargeback costs related to th[e] Agreement").[14]

      The Agreement dictated the parties' duties, and it was unreasonable for the Plaintiffs to rely on statements that contradict the Agreement. Since the Plaintiffs fail to adequately plead reasonable reliance, they do not state a viable fraud claim.

---

[14] The Plaintiffs also allege that the Defendants "falsely represented that the application of Peter Marco would be underwritten before it was approved." Am. Compl. ¶ 92. But that allegation contradicts another one. *See id.* ¶ 17 ("Upon information and belief, BAMS and/or FDMS performed underwriting related to Peter Marco's merchant account application.").

17

####    4.    Negligence

The Plaintiffs fail to state a valid negligence claim because they plead "purely economic losses," which are "not recoverable under tort law." *Crescent Univ. City Venture, LLC v. Trussway Mfg., Inc.*, 852 S.E.2d 98, 102 (N.C. 2020); *see also 2000 Watermark Ass'n, Inc. v. Celotex Corp.*, 784 F.2d 1183, 1186 (4th Cir. 1986) ("[T]he majority of courts have required that there be injury to person or property before imposing tort liability."). North Carolina's economic-loss rule "bars recovery in tort by a plaintiff against a promisor for his simple failure to perform his contract, even though such failure was due to negligence or lack of skill." *Crescent Univ.*, 852 S.E.2d at 102. Because "parties generally do not owe each other a duty of care to prevent economic loss," the economic-loss rule "requires negligence claims to be based upon the violation of an extra-contractual duty imposed by operation of law." *Id.* at 99.

Here, the Plaintiffs plead only economic losses related to the Defendants' alleged contractual violations. They claim that the Defendants acted negligently in failing to "monitor [their] agents, underwrite . . . Peter Marco's account and defend Peter Marco." Am. Compl. ¶ 120. They also allege that the Defendants' alleged negligence resulted in "the placement of Peter Marco on the MATCH list, [the] holding of Peter Marco's funds and [the] termination of Peter Marco's ability to process electronic payments." *Id.* These actions allegedly damaged the Plaintiffs "in an amount . . . which is no less than $8,000,000.00." *Id.* ¶ 124. These allegations concern economic losses that are "the subject matter of a contract." *Crescent Univ.*, 852 S.E.2d at 104. Accordingly, the economic-loss rule bars the Plaintiffs' negligence claim.[15]

---

[15] The M&R analyzed the Plaintiffs' negligence claim as a negligent-misrepresentation claim, but the Amended Complaint pleads only ordinary negligence. *See* Am. Compl. ¶¶ 117–24 (labeling the seventh cause of action "Negligence" and discussing duty, breach, causation, and damages). Even if the Plaintiffs' claim could be construed as a negligent-misrepresentation claim, it would not only be barred under the economic-loss rule but also fail for the same reason that the fraud

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. The M&R (Doc. No. 47) is **ADOPTED in part**. Specifically, the M&R is **NOT ADOPTED** as to the Plaintiffs' claims for breach of contract, breach of fiduciary duty, fraud, and negligence. The M&R is otherwise **ADOPTED**.

2. The Defendants' Motion to Dismiss (Doc. No. 38) is **GRANTED**.

3. This case is **DISMISSED WITHOUT PREJUDICE**.

The Clerk of Court is directed to close this case.

Signed: March 9, 2023

Robert J. Conrad, Jr.
United States District Judge

---

claim fails: the Plaintiffs plead no facts showing reasonable or justifiable reliance. *See Helms v. Holland*, 478 S.E.2d 513, 517 (N.C. Ct. App. 1996) ("Justifiable reliance is an essential element of both fraud and negligent misrepresentation."); *Walker v. Town of Stoneville*, 712 S.E.2d 239, 244 (N.C. Ct. App. 2011) (stating that the "question of justifiable reliance [in negligent-misrepresentation actions] is analogous to that of reasonable reliance in fraud actions" (quoting *Marcus Bros. Textiles, Inc. v. Price Waterhouse, L.L.P.*, 513 S.E.2d 320, 327 (1999))).